# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

COLLEEN J. BLOCK,

        **Plaintiff,**

    v.                        **Case No. 05-C-464**

WAUWATOSA SAVINGS BANK,

        **Defendant.**

---

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

---

On April 22, 2005, Colleen Block ("Block") filed a complaint alleging that her former employer, Wauwatosa Savings Bank ("WSB") and her former supervisor Jamie Sinkovits ("Sinkovits") violated the Family and Medical Leave Act of 1993, 29 U.S.C. § 2601 et. seq., ("FMLA") by interfering with Block's exercise of rights guaranteed to her under the FMLA and by refusing to reinstate her to an equivalent position. On August 29, 2005, Block filed an amended complaint removing Sinkovits as a defendant. Defendant WSB filed an amended answer and asserted various affirmative defenses including that Block was terminated for legitimate reasons unrelated to her taking FMLA leave. The parties have consented to the full jurisdiction of a magistrate judge.

Following a period for discovery, on April 13, 2006, WSB motioned for summary judgment. The pleadings on WSB's motion are closed and the matter is ready for resolution. Before addressing the merits of the motion, a brief comment on the defendant's failure to submit separately numbered factual propositions in accordance with Civil L.R. 56.2(a)(2). The defendant has failed to comply with this rule, but in this case, the failure is merely one of format. A review of the

defendant's brief discloses that the "Facts" section sets out separate factual propositions each supported with a reference to the record. While it is true that they are not numbered, which makes specific response by plaintiff difficult, in this case, the defendant's failure has not hindered the plaintiff from responding, or the court from being able to consider the record.

## FACTUAL SUMMARY

Block began working for WSB as a teller at the State Street branch in 2003. (Block Dep. 12.) In August of 2004, Block became the lead teller at WSB's Oak Creek branch. (Block Dep. 13, 40.) Beginning in September of 2004, Sinkovits was Block's immediate supervisor at the Oak Creek branch. (Sinkovits Dep. 9.) Sinkovits repeatedly had problems with Block's job performance, (Sinkovits Dep. 23, 51, 54-55) two instances of which were documented in the form of written warnings (Sinkovits Dep. Ex. 2). These forms were both signed by Sinkovits and Block on November 1, 2004. (Sinkovits Dep. Ex. 2.) On the first form, in the space captioned "Description of Inappropriate Conduct" it is written, "Insubordination, Failure to Recognize and accept the authority of her supervisor and Manager (see attached action plan)." (Sinkovits Dep. Ex. 2.) On the same space on the second form "Failure to follow the banks chain of command (see attached action plan.) Cari Koenissreiter has Disc chain of command on the following dates Sept 2nd, Sept 14th, and Sept 27, 2004," is written. (Sinkovits Dep. Ex. 2.)

A "Performance Action Plan for Colleen Block" dated November 1, 2004 is included as Exhibit 9 to Sinkovits' deposition. The plan states that it was created "because we have identified that Colleen Block, Oak Creek Lead Teller, has failed to meet the expectations and standards of her position set fourth [sic] in her job description." (Sinkovits Dep. Ex. 9.) The plan goes on to state that Block must meet the expectations and responsibilities outlined in her job description by December 1, 2004 or else her employment with WSB will be terminated. (Sinkovits Dep. Ex. 9.)

The plan further states that "any unacceptable conduct during or after that timeframe will result in termination." (Sinkovits Dep. Ex. 9.)

On November 24, 2004, Block began a medical leave. (Compl. ¶10; Sinkovits Dep. Ex. 16.) On approximately December 20, 2004, while on leave, Block received a letter from WSB terminating her employment. (Compl. ¶12; Sinkovits Dep. Ex. 19.) As reasons for her termination, the letter references Block's earlier discipline and states that WSB discovered on November 24, 2004 that Block had failed to record a cash order that came in on November 23, 2004, which resulted in a $230,000 discrepancy in the vault. (Sinkovits Dep. Ex. 19.) The letter also stated that Block had failed to conduct a required weekly cash drawer audit for the weeks of November 8th and November 15th. (Sinkovits Dep. Ex. 19.) This letter further indicated that all accounts held at WSB in Block's name were closed and checks were enclosed. (Sinkovits Dep. Ex. 19.) Additional facts will be referred to as needed during the course of the court's discussion.

## SUMMARY JUDGMENT STANDARD

A motion for summary judgment will be granted when there are no genuine issues as to material fact and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). As provided under Rule 56(c), only "genuine" issues of "material" fact will defeat an otherwise "proper" motion for summary judgment. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Material facts are those facts that under the governing substantive law might affect the outcome of the suit. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute of such material facts is "genuine" if the evidence is such that a reasonable trier of fact could find in favor of the nonmoving party. Id.

The movant bears the burden to establish that there is no genuine issue of material fact and that he or she is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Adickes v. S.H. Kress & Co., 398 U.S. 144, 159 (1970); see also Celotex Corp., 477 U.S. at 323. The moving party

satisfies its burden by demonstrating "that there is an absence of evidence to support the nonmoving party's case." Celotex Corp., 477 U.S. at 325. Any doubt as to the existence of a genuine issue for trial is resolved against the moving party. Anderson, 477 U.S. at 255; Cain v. Lane, 857 F.2d 1139, 1142 (7th Cir. 1988); Spring v. Sheboygan Area School Dist., 865 F.2d 883, 886 (7th Cir. 1989). Further, "on summary judgment, a court can neither make a credibility determination nor choose between competing interests." Sarsha v. Sears, Roebuck & Co., 3 F.3d 1035, 1041 (7th Cir. 1993).

If the moving party meets its burden, the nonmoving party then has the burden to present specific facts showing that there is a genuine issue of material fact. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986).

## ANALYSIS

WSB argues that Block has failed to set forth a prima facie case of discrimination under the framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-03 (1973). Under the burden shifting framework set forth in McDonnell Douglas a plaintiff must demonstrate (1) that she exercised her rights under the FMLA; (2) that was adversely affected by an employment decision; and (3) there is a causal connection between the exercise of rights under the FMLA and the adverse employment action. King v. Preferred Tech. Group, 166 F.3d 887, 892 (7th Cir. 1999). WSB alleges that Block is unable to establish a causal connection between her FMLA leave and her termination. Specifically, WSB argues that certain undisputed facts, specifically that Block was an at-will employee who was subject to a written 30-day Performance Action Plan, preclude Block from being able to demonstrate a causal connection between her termination and her exercise of rights under the FMLA.

If Block is able to demonstrate a prima facie case, WSB argues that it is able to demonstrate a valid, non-discriminatory reason for the adverse job action it took. Specifically, WSB argues that the undisputed evidence indicates that Block was fired due to her poor work performance and Block

is not able to demonstrate that this reason was merely pretextual. Therefore, Block is unable to demonstrate that she was entitled to be reinstated to her former position.

In her response, Block disputes the basis for WSB's discipline. Specifically, Block argues that she did not fail to follow WSB's chain of command and was not insubordinate. Block then goes on to argue that she should be provided wide latitude in demonstrating WSB's intent because discriminatory intent is notoriously difficult to prove. Block argues that she has presented sufficient evidence that she was adequately performing her job to raise the inference that her termination may have been discriminatory.

Block further argues that she has adequately demonstrated that WSB's stated reasons for terminating Block were pretextual. Block's argument is based in large part upon the deposition of testimony of Andrew Taylor, Vice-President of Retail Sales at WSB, who stated on page thirty-three of his deposition that he and another WSB employee agreed after meeting with Block that the company had "screwed" Block in that Block was a good employee and WSB "as a company, let her down." (Taylor Dep. 33.) Cheryl Brah ("Brah"), Director of Employee Services and Assistant Vice President, similarly stated in her deposition that Block had been "screwed" by WSB. (Brah Dep. 17.)

Block then argues that the termination letter contained false information and that WSB violated its own policies by issuing Block two written warnings on the same day for the same infraction. Although the letter stated that Block was terminated for failing to record a cash delivery, Block argues that this was not her responsibility and therefore termination on this basis was inappropriate. She also argues that she was unaware that auditing her own cash drawer was unacceptable and therefore did not fail to conduct the required audits. It is Block's position that these discrepancies create sufficient factual questions that must be resolved by a jury.

It is undisputed that Block took a medical leave that was covered under the FMLA. It is similarly undisputed that Block was terminated while on this leave. Therefore, Block satisfies the first two elements of the McDonnell Douglas burden-shifting framework. However, the parties disagree as to whether Block has demonstrated that there is a causal connection between Block's termination and her taking leave.

"To demonstrate a 'causal link,' the employee must demonstrate that the employer would not have taken the adverse employment action but for the employee's protected activity." King v. Preferred Technical Group, 166 F.3d 887, 892 (7th Cir. 1999) (citing Johnson v. City of Fort Wayne, 91 F.3d 922, 939 (7th Cir. 1996)). A causal link may be demonstrated when there is a temporal proximity between the employee's protected activity and the adverse employment action. Id. at 893. In the present case, there is an obvious temporal proximity between Block's leave and her termination; Block was terminated while on FMLA leave. Therefore, Block has set forth the three elements of a prima facie case.

Under the McDonnell Douglas burden-shifting framework, after Block demonstrates a prima facie case, the burden then shifts to the employer to articulate a legitimate, non-discriminatory reason for the employment action. Id. at 892 (citing Johnson, 91 F.3d at 939). WSB is not required to demonstrate that it actually relied upon its proffered explanation; "it must only raise a genuine issue of fact as to whether it discriminated against the plaintiff." Id. at 893 (quoting Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 254 (1981).

WSB argues that the evidence indicating Block's deficient work performance presents a legitimate non-discriminatory reason for terminating Block. The court agrees that the reasons stated in WSB's letter terminating Block present a legitimate non-discriminatory reason for WSB's action. By proffering a legitimate non-discriminatory reason for its action, the presumption that WSB discriminated against Block effectively "drops out of the picture." Id. It then becomes Block's

burden to demonstrate that WSB's stated reasons were merely pretextual and that WSB's motive in terminating Block was discriminatory. Id. At the summary judgment stage, the plaintiff must "'produce evidence from which a rational factfinder could infer that the company lied' about its proffered reasons for [the employee's] dismissal." Anderson v. Baxter Healthcare Corp., 13 F.3d 1120, 1124 (7th Cir. 1994) (quoting Shager v. Upjohn Co., 913 F.2d 398, 401 (7th Cir. 1990)).

WSB argues that Block is unable to demonstrate that its motives were discriminatory. Block argues that numerous facts raise the inference of discrimination and it is up to a jury to determine whether Block was in fact discriminated against.

Block relies heavily upon the testimony of Taylor, who stated "we screwed this poor woman" in reference to WSB's treatment of Block. (Taylor Dep. 33.) Brah made a similar statement (Brah Dep. 18) and Barbara Coutley ("Coutley"), Senior Vice-President, agreed with this characterization (Coutley Dep. 40). However, as is often the case with slang language, context is important. In isolation, these statements may tend to support Block's claims that WSB's stated reasons were pretextual, but this support is defeated when the statements are viewed in context.

Based upon the entire context of Taylor's statement, it appears that Taylor believed that Block's decline in her performance was a consequence of ineffective and inexperienced management and the general disorganization at the Oak Creek branch rather than any real change on the part of Block. Immediately prior to Taylor's statement that Block had been "screwed" he discussed how much of the Oak Creek branch staff was inexperienced and how it resulted in Block being placed into a position where "she had no direction, no management and absolutely no support to get her job done in a new capacity." (Taylor Dep. 32.)

Taylor then recounts a conversation he had with Judy Gebhard ("Gebhard"), who used to be Block's manager at the State Street branch. After learning that Block was a "wonderful employee" at the State Street branch, Taylor asked Gebhard, "How can we have a wonderful employee at one

branch and she moves to another branch, and she's a horrible employee? How does that work?" (Taylor Dep. 32.) Taylor stated that Gebhard responded to his question by saying that Block would call her in tears and report that she was receiving no support or direction from the people at the Oak Creek branch. (Taylor Dep. 32-33.) Taylor then says that it was not normal for WSB to permit employees to come back and talk to WSB management after having been terminated, yet it was done in Block's case. (Taylor Dep. 33.) Taylor then concludes by saying, "Barbara [Coutley] and I agreed we screwed this poor woman. She was a good employee; and we, as a company, let her down." (Taylor Dep. 33.)

Based upon the entire context of Taylor's statement, there is nothing to indicate that Taylor intended that Block was "screwed" by WSB in that she was discriminated against for having taken medical leave. All of Taylor's statements indicate that he felt that WSB should have offered more support to Block to enable her to succeed in her new position, and it was in this regard that WSB "screwed" Block. An employer's failure to provide adequate support to an employee does not violate the FMLA and there is absolutely no evidence to suggest that there was a causal connection between WSB's failure to support Block and Block's taking a medical leave.

When Brah said that she felt that Block had been screwed by WSB, she apparently meant something slightly different than Taylor. Immediately after stating in her deposition that she told Coutley that Block had been screwed in the discharge, Brah explained what she meant by this. Brah stated, "That while her termination was warranted, her discipline process could have been handled better." (Brah Dep. 18.) Thus, again it is clear that Brah is in no way stating that she felt that WSB "screwed" Block by terminating her for taking a medical leave.

Coutley testified that she agreed with Brah's characterization and there is absolutely no evidence that she was somehow stating that she felt that WSB "screwed" Block by terminating her for taking a medical leave. (Coutley Dep. 40.) The only further explanation that Coutley provided

as to what she meant by her agreement with Brah's statement is when Coutley said, "That based on what Colleen had said, I agreed; but I didn't know anything at that point of what transpired before that led up to the termination." (Coutley Dep. 41.) Even if Coutley was in fact stating that she felt that Block was improperly terminated for having taken medical leave, Coutley admittedly lacked the knowledge to determine whether Brock's termination was justified.

Block next disputes the factual accuracy of the allegations levied in the termination letter and the written warnings she received. Block alleges that she was not insubordinate and cites her deposition testimony in support. However, in her deposition, Block states that her supervisor did not *explicitly* state that Block's conduct was insubordinate and that Block was merely joking when she sent an email asking if she could sleep in her supervisor's office. (Block Dep. 48.)

Block further alleges that she did not fail to follow the chain of command, did not allow unauthorized persons into the bank's vault, was not openly critical of Sinkovits, and did not view Sinkovits' confidential notes. (Block Aff.) Block further asserts that she did not send a derogatory email to Sinkovits (Block Dep. 49) and argues in her response that she did not refer to Sinkovits' plan for scheduling lunches as "stupid" in front of other employees and cites pages twenty-nine and thirty of her deposition in support. (Resp. 6.) However, Block does not say in her deposition that she never called Sinkovits' plan "stupid" in front of other employees; she states in her deposition merely that she never discussed the lunch schedule on the bank floor. (Block Dep 29-30.)

WSB also argues that Block's affidavit, which states, "I did not view Ms. Sinkovits' confidential notes" conflicts with her deposition testimony where Block said "Yes" when she was asked, "Did you ever admit to reading Jami's personal notebook?" (Reply 2.) WSB cites page thirty-one of Block's deposition. Based upon the excerpts quoted in WSB's reply, there is no direct contradiction. In the deposition, Block was asked if she ever admitted to reading Sinkovits'

notebook. It is possible that Block may have stated that she read the notebook while never actually doing so, as is asserted in her affidavit.

Similarly, WSB argues that Block's statement "I did not make mistakes during the 30 day coaching period" (Block Aff. ¶6) is a self-serving and conclusory attempt to manufacture a factual dispute and is contradicted by Block's deposition testimony. WSB points to pages thirty-six and thirty-seven of Block's deposition in which she stated that she had audited a cash drawer without having someone else verify it, despite the fact that two people usually are required to conduct an audit. Again, Block's testimony does not necessarily contradict with her statement in her affidavit. Simply because two people are usually required to conduct an audit does not necessarily mean that it is a mistake to have one person do so. This court is not able to, nor is it necessary that this court determine whether having one person audit a drawer would constitute a mistake.

It is undisputed that Block was teetering on the edge of termination. Something pushed her over that edge. The question presented by Block's complaint is, what was that push? Block alleges that it was her taking FMLA leave. WSB alleges it was Block's failure to record a $230,000 cash delivery to the bank's vault and her failure to properly conduct audits of cash drawers.

"[A]t the summary judgment stage, the non-movants must 'produce evidence from which a rational factfinder could infer that the company lied' about its proffered reasons for [the employees'] dismissal." Schultz v. General Elec. Capital Corp., 37 F.3d 329, 333-34 (7th Cir. 1994) (quoting Anderson, 13 F.3d at 1124 (quoting Shager, 913 F.2d at 401)). Block fails to put forth any evidence that would permit a reasonable factfinder to conclude that it was her taking FMLA leave that motivated her termination. Although two managers at WSB stated that WSB had "screwed" Block, it is only when these statements are viewed out of context that these statements could be regarded as supporting Block's argument. When properly viewed in context it is clear that both these managers were speaking of WSB's mismanagement rather than indicating that Block had

been terminated for taking FMLA leave. There is no indication that WSB's mismanagement resulted in discrimination.

Additionally, Block does not dispute the factual accuracy of the two central allegations levied in the termination letter; Block argues merely that it was not an error to conduct an audit on her own drawer and that it was not her responsibility to record the cash delivery. As noted in Schultz, "[a]ttempts to shift blame are generally not useful in showing pretext" because they do nothing to demonstrate that the employer was lying about its stated reasons for the termination. 37 F.3d at 334.

Block's assertion that she did not make any mistakes in November is insufficient to create a dispute of material fact. Block's own opinion of her performance is irrelevant. See Luks v. Baxter Healthcare Corp., 2006 U.S. App. LEXIS 27263, *19 (7th Cir.) (citing Jackson v. E.J. Brach Corp., 176 F.3d 971, 985 (7th Cir. 1999)). The question is not whether Block believed she had made mistakes, or if she had in fact made mistakes. See id. Rather, the only relevant question is whether WSB's management honestly believed that Block had made mistakes. Id. Block provides no evidence to suggest that WSB's management did not honestly believe that Block had made mistakes.

Additionally, aside from Block's conclusory statement in her affidavit in which she asserts that she did not make any mistakes during November, Block does not dispute that she failed to conduct an audit for the week of November 15th. Block does not dispute that a weekly audit is an expectation of a lead-teller at WSB. (See also, Sinkovits Dep. Ex. 8 "Lead Teller Expectations.") Thus, it is undisputed that Block engaged in "unacceptable conduct" during November by failing to perform the duties expected in her role as a lead teller. The Performance Action Plan, which was drafted and implemented before Block began her leave and, in fact, before there was any indication that Block intended to take such a leave, clearly states that any "unacceptable conduct . . . will

result in termination." To the extent that Block's unsupported and conclusory statement in her affidavit may contradict this fact, this dispute does not create a genuine dispute of material fact, because "an employee's own self-serving remarks standing alone are insufficient to raise doubt as to the credence of the employer's explanation for termination." Schultz, 37 F.3d at 334 (citations and quotations omitted); see also Jackson, 176 F.3d at 985 (citing Gustovich v. AT&T Communications, Inc., 972 F.2d 845, 848 (7th Cir. 1992)).

Block relies upon speculation and isolated quotes taken out of context. This evidence does not create a genuine dispute of material fact because no reasonable fact finder could find in favor of Block. Therefore, WSB's motion shall be granted.

**IT IS THEREFORE ORDERED** that Wauwatosa Savings Bank's motion for summary judgment is **granted**. The clerk shall enter judgment dismissing Block's complaint and this case with prejudice.

Dated at Milwaukee, Wisconsin, this 21st day of November, 2006.

s/AARON E. GOODSTEIN
U.S. Magistrate Judge